UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| INTERCONNECT MEDIA NETWORK SYSTEMS, LLC dba SIMULTV | CIVIL ACTION NO. 21-4212 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| DEVELOPERS & MANAGERS GROUP, LLC, ET AL. | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Preliminary Injunction or, in the alternative, Motion for Writ of Sequestration (Record Document 4) filed by Plaintiff, Interconnect Media Network Systems, LLC, d/b/a SimulTV ("SimulTV"). Defendant Developers & Managers Group, LLC ("DMG") opposed the Motion (Record Document 27) and SimulTV replied (Record Document 34). For the reasons set forth herein, the Motion for Preliminary Injunction is **GRANTED**.

**FACTUAL AND PROCEDURAL BACKGROUND[1]**

This suit arises out of a contractual relationship between SimulTV and DMG, which was born from contractual relationships between SimulTV and Maybacks[2] and DMG and Maybacks.[3] As of December 2020, DMG fully owned three television stations located in Shreveport, Monroe, and Alexandria, Louisiana, (the "TV Stations") as well as the FCC licenses coinciding with the TV Stations. See Record Document 4 at 8, 9. DMG leased

---

[1] To the extent that the Court makes any findings of fact in this section, those findings are limited to the instant Motion.

[2] Maybacks Global Entertainment LLC d/b/a Holyfield TV Networks (hereinafter referred to as "Maybacks")

[3] The history between the parties and the nature of the parties' relationships were discussed at-length in the Court's Memorandum Ruling issued on July 12, 2023. See Record Document 52. That history need not be repeated here. This section will instead focus on the contracts between the parties, as those facts are central to the claim for a preliminary injunction.

space at three broadcast-tower sites in each of the cities to house the necessary equipment to allow the TV Stations to broadcast. See id. at 9. However, DMG owed unpaid rent to the tower owners and was also at risk of losing the Alexandria and Monroe FCC broadcasting licenses. See id. In December 2020, DMG and Maybacks executed an agreement for Maybacks to provide funding to DMG in order for DMG to buy new equipment and pay off the unpaid rent to the tower owners (the "DMG-Maybacks Agreement"). See id.

As part of the DMG-Maybacks Agreement, Maybacks agreed to pay $225,000 to DMG via cash or promissory note and buy and/or install certain equipment at the tower sites. See id. In return, among other things, Maybacks acquired a 40% interest in the equity profits derived from the TV Stations and obtained a one-year option to purchase a 40% ownership in the TV Stations. See id. However, according to the Amended Complaint, Maybacks was unable to fulfill its financial obligation pursuant to the DMG-Maybacks Agreement. See Record Document 13 at ¶ 71.

In February 2021, Maybacks contacted SimulTV to inform it of the agreement between DMG and Maybacks and to discuss Maybacks' inability to satisfy the $225,000 obligation to DMG. See id. at ¶ 75. After negotiations, SimulTV entered into an agreement with DMG wherein SimulTV agreed to fulfill Maybacks' obligations to DMG and introduced additional terms and rights that SimulTV would acquire pursuant to the agreement. See id. at ¶¶ 74-104. Specifically, SimulTV and DMG executed a "Letter of Intent Regarding Purchase of a 40% Ownership Interest & LMA" (the "SimulTV-DMG Agreement") in which SimulTV agreed to pay $225,000 to DMG as follows: (1) an initial payment of $25,000 at

the time the agreement was signed; and (2) the additional $200,000 "over time" at the rate of 15% of the TV Stations' gross revenue. See Record Document 4 at 10.

Additionally, the SimulTV-DMG Agreement differed from the DMG-Maybacks Agreement in several regards. First, when SimulTV made the initial $25,000 payment to DMG (as referenced above), SimulTV instantly acquired a 40% ownership interest in the TV Stations and a 50% ownership interest in the licenses, facility IDs, call numbers, and equipment. See id.; see also Record Document 13-3 at 4. Second, the SimulTV-DMG Agreement gives SimulTV a three-year option period to purchase outright "all equity, interests, and assets of [DMG] and the [TV] Stations not already owned by SimulTV, for the total price of six hundred thousand dollars ($600,000)." Record Document 13-3 at 4. Third, the SimulTV-DMG Agreement voided the DMG-Maybacks Agreement. See id. at 5. The SimulTV-DMG Agreement is dated June 4, 2021, and is signed by authorized officers for DMG, SimulTV, and Maybacks. See id. at 2, 12.

After the SimulTV-DMG Agreement was memorialized, SimulTV bought and installed equipment at the Alexandria and Monroe stations; selected and provided all programming for those two TV Stations; convinced two of the broadcast-tower owners to forgive a portion of DMG's unpaid rent; and negotiated and executed new lease agreements with the tower owners in Shreveport, Monroe, and Alexandria. See Record Document 4 at 10-11. SimulTV asserts (and DMG does not seem contest) that because of SimulTV's actions and capital, DMG was able to avoid losing the Alexandria and Monroe FCC licenses and those stations became operational again in October 2021. See id.

However, on October 15, 2021 (after the TV Stations became operational again), DMG sent a default letter to Simul TV alleging ten (10) contractual defaults and demanding that SimulTV cure some of the defaults within three calendar days.[4] See Record Document 13 at ¶ 182; see also Record Document 13-7 at 3. Each of the ten alleged defaults are contained in the Amended Complaint, but SimulTV highlights three in its Motion: DMG alleged that SimulTV breached the agreement by failing to execute a $200,000 promissory note or timely pay the $25,000[5]; DMG alleged that SimulTV failed to pay DMG 60% of equity profits; and DMG argued that SimulTV committed a contractual default by warranting that it was organized under the laws of Arizona. See Record Document 13-7 at ¶¶ 6, 7, and 10; see also Record Document 4 at 11. Additionally, DMG alleged that SimulTV performed "unauthorized work" at the Monroe transmitter site. See Record Document 13-7 at ¶ 2.

On October 18, 2021, SimulTV, through its counsel, responded to the letter addressing each of the alleged defaults and why SimulTV believed it had not defaulted. See Record Document 4 at 12; see also Record Document 13-8. Four days later, on October 22, 2021, DMG sent a letter to SimulTV's counsel terminating the SimulTV-DMG Agreement because SimulTV failed to cure the alleged defaults within three days. See Record Document 4 at 12; see also Record Document 13-9 at 2-3.

According to SimulTV, DMG and SimulTV held a telephone call on November 3, 2021, to discuss the termination letter. See Record Document 13 at ¶ 227. The Amended

---

[4] This demand for cure within three calendar days was made despite the fact that the SimulTV-DMG Agreement contained a provision allowing for ninety (90) days to cure an "Event of Default"—unless that Event of Default is SimulTV's failure to compensate DMG "as provided herein," which is subject to a three (3) day cure period. See Record Document 13-3 at 8.

[5] SimulTV avers that it wired the initial $25,000 to DMG three days after signing the SimulTV-DMG Agreement. See Record Document 13 at ¶ 198.

Complaint alleges that during that phone call, DMG informed SimulTV that it had received "multiple 'generous' offers" on one or more of the TV Stations and asked SimulTV to commit in writing to purchase the TV Stations by December 31, 2021. Id. at ¶¶ 229, 230. When SimulTV's counsel then reached out on November 10, 2021, to resume the conversation, DMG stated there was nothing further to discuss since the SimulTV-DMG Agreement had been terminated. See id. at ¶ 232.

On November 12, 2021, SimulTV sent a letter to DMG exercising its option under the SimulTV-DMG Agreement to purchase the three TV Stations and all of DMG's equity, interests, and assets. See id. at ¶ 236. SimulTV also emailed DMG that same day, asking for, *inter alia*, confirmation that DMG is not intending to and will not sell the TV Stations to anyone other than SimulTV before the expiration of SimulTV's three-year option period to purchase the TV Stations. See id. at ¶ 235. Apparently not receiving any confirmation that DMG would not execute a sale to a third party, SimulTV filed this suit and the instant Motion, seeking to enjoin DMG from executing a sale to a third party. See Record Document 4 at 12-13.

## LAW AND ANALYSIS

### I.   Preliminary Injunction Standard

"A preliminary injunction is an 'extraordinary and drastic remedy'; it is never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90, 128 S. Ct. 2207 (2008) (internal citations omitted). "The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits." City of Dallas v. Delta Air Lines, Inc., 847 F.3d 279, 285 (5th Cir. 2017). "The decision to grant or deny a preliminary injunction is

5

discretionary with the district court." Mississippi Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985).

A party seeking a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure must show: (1) a substantial likelihood of success on the merits; (2) that the movant will suffer irreparable injury without the injunction; (3) that the threatened injury to the movant outweighs the threatened harm to the party whom he seeks to enjoin; and (4) that granting the injunction will not disserve the public interest. See Lakedreams v. Taylor, 92 F.2d 1103, 1107 (5th Cir. 1991). An injunction should only be granted if the movant has clearly carried the burden of persuasion with respect to all four factors. See Allied Mktg. Grp., Inc. v. CDL Mktg., Inc. 878 F.2d 806, 809 (5th Cir. 1989); see also Mississippi Power & Light, 760 F.2d at 621.

To prove a likelihood of success on the merits, the moving party must show that it will "likely prove" the merits of its claims. See Mylan Institutional LLC v. Aurobindo Pharma Ltd., 857 F.3d 858, 866 (Fed. Cir. 2017). The standard for proving irreparable injury is not a mere possibility, but a likelihood:

> Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction. Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22, 129 S. Ct. 365 (2008) (internal citations omitted). The third prong of the test requires the Court to balance the harm that would be suffered by the movants if the injunction were denied against the possible harm that would result to the opposing party if the injunction were granted. See Mississippi Power & Light Co., 760 F.2d at 626. The fourth prong of the test requires the Court to

6

determine whether granting the injunctive relief will disserve the public interest. See id. at 625-26.

II.     Analysis

a. SimulTV has Substantial Likelihood of Success on the Merits

SimulTV must first establish that it has a substantial likelihood on the merits of its claims. "In establishing a 'substantial likelihood of success,' the movant 'is not required to prove his entitlement to summary judgment for purposes of [a] preliminary injunction.'" City of Dallas, 847 F.3d at 286 (quoting Byrum v. Landreth, 566 F.3d 442, 446 (5th Cir. 2009)). To assess the likelihood for success, courts look to the standards provided by the substantive law. See City of Dallas, 847 F.3d at 286 (citing Janvey v. Alguire, 647 F.3d 585, 595-96 (5th Cir. 2011)). Here, SimulTV asserts substantive claims for specific performance, declaratory judgment, and breach of contract.

First, SimulTV argues that it has a substantial likelihood on the merits of its claim for specific performance. See Record Document 4 at 14. The SimulTV-DMG Agreement contains, among other provisions, an option agreement wherein SimulTV may purchase outright "all equity, interests, and assets of [DMG] and the [TV] Stations not already owned by SimulTV, for the total price of six hundred thousand dollars ($600,000)." Record Document 13-3 at 4. DMG asserts that SimulTV cannot establish it has a substantial likelihood on the merits of this claim because SimulTV "fraudulently misrepresented material facts" in the SimulTV-DMG agreement. Record Document 27 at 8. Specifically, DMG asserts that its consent to the contract is vitiated based on either fraud or error, pursuant to Louisiana Civil Code article 1948. See id. To support this argument, DMG

7

cites the DMG-Maybacks Agreement and explains that the DMG-Maybacks Agreement is silent as to the prospective purchase of DMG's assets. See id. at 9-10.

Under Louisiana law, an option agreement or option clause is subject to specific performance. See, e.g., J.F. Auderer Labs., Inc. v. Deas, 67 So. 2d 179, 182 (La. 1953); Fontenot v. Manuel, 281 So. 2d 156, 161 (La. App. 3d Cir. 1973). For breach of contract, specific performance is the preferred remedy. See Olympia Minerals, LLC v. HS Res., Inc., 171 So. 3d 878, 901 (La. 2014) (citing La. Civ. Code art. 1986). The Louisiana Civil Code states that a court shall grant specific performance unless specific performance is impracticable. See La. Civ. Code art. 1986.

The Court, in reading DMG's opposition to SimulTV's Motion, interprets DMG to argue that SimulTV fraudulently misrepresented material facts by including terms in the SimulTV-DMG Agreement that were not present in the DMG-Maybacks Agreement. However, the Court is not persuaded by DMG's argument at this stage. "A person who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, or that it was not explained, or that he did not understand it." Wagner v. DA Exterminating Co. of St. Tammany, Inc. 324 So. 3d 105, 111 (La. App. 1st Cir. 2021) (citing Williams v. Interstate Dodge, Inc., 34 So. 3d 1151, 1156 (La. App. 2d Cir. 2010)). DMG did not cite any argument to give the Court a basis to find that SimulTV somehow fraudulently misrepresented a contract provision when that provision was included in the document that DMG signed after months of negotiations with SimulTV. Because the provision was included in the SimulTV-DMG Agreement, DMG is presumed to know that this provision was in the Agreement.

While the Court need not, and will not, decide the merits of the case at this juncture, the Court nonetheless finds that SimulTV has met its burden to establish that it will more than likely prevail on the merits of its claim for specific performance. Since the Court finds that SimulTV has met its burden on this factor for the specific performance claim, the Court need not find that SimulTV has a substantial likelihood of success on its other claims. See Lakedreams, 932 F.2d at 1107. Thus, the Court's analysis will turn to the second factor.

### b. Threat of Irreparable Injury Exists

Next, SimulTV must show that it will suffer irreparable injury if the preliminary injunction is denied. To show irreparable harm, a party must demonstrate "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." Humana, Inc. v. Jacobson, 804 F.2d 1390, 1394 (5th Cir. 1986). "[T]he mere fact that economic damages may be available" does not necessarily mean that monetary damages would fully repair the harm. Janvey, 647 F.3d at 600. When economic rights are involved, irreparable harm exists if the "nature of those rights makes establishment of the dollar value of the loss especially difficult or speculative." Allied Mktg. Grp., Inc., 878 F.2d at 810. Potential irreparable harm exists if, absent an injunction, defendants could dispose of at-issue assets. See Janvey, 647 F.3d at 599. Courts may enjoin the disposal of at-issue assets if "reasonably necessary" to preserve the possibility of complete and meaningful relief for plaintiffs. Commodity Futures Trading Comm'n v. Muller, 570 F.2d 1296, 1301 (5th Cir. 1978). An injunction is appropriate only if the anticipated injury is imminent and not speculative. See Winter, 555 U.S. at 22.

SimulTV argues that it will suffer irreparable harm if DMG is permitted to sell the TV Stations and DMG's equity, interests, and assets that SimulTV has a contractual option to buy outright. See Record Document 4 at 19. DMG opposes this argument, stating that SimulTV's damages can be quantified and SimulTV has not been prevented from pursuing other business opportunities. See Record Document 27 at 13-15. Further, DMG "assured" the Court that it is not looking to sell the assets, nor does it have any offers on the table. See id. at 13.

The Court finds that SimulTV has shown it would suffer imminent irreparable harm. Before SimulTV filed suit, DMG never provided SimulTV with any assurance that it would not sell the TV Stations and related assets referenced in the SimulTV-DMG Agreement. Additionally, the fact that DMG did not have any current offers at the time of writing its opposition to the Motion does not assuage the Court's concerns that offers were communicated when SimulTV filed its motion for a preliminary injunction. Indeed, this Court need not find that DMG is "in the process or on the verge of dissipating assets." Fed. Sav. & Loan Ins. Corp. v. Dixon, 835 F.2d 554, 559 (5th Cir. 1987); see also Humana, Inc., 804 F.2d at 1394 ("To show irreparable injury ... it is not necessary to demonstrate that the harm is inevitable."). Rather, as explained by the Fifth Circuit in Janvey, the fact that DMG could dispose of at-issue assets absent an injunction gives the Court cause for concern. 647 F.3d at 600. The Court believes that an injunction is reasonably necessary here to prevent DMG from disposing of at-issue assets so that the Court can issue a ruling on the complete merits of the case. Therefore, the Court finds that SimulTV has met its burden of proving that the threat of injury is imminent, not merely speculative.

SimulTV has also met its burden to show that money damages would not fully repair the harm. While money damages could repair some of the harm if the injunction is not granted, such a remedy would be inadequate. If the injunction is not granted, SimulTV asserts that it would lose revenue from advertisement, the opportunity to build customer branding and awareness, and the opportunity to test proprietary technology, among other things. See Record Document 34 at 11.

While the damages for loss of revenue can be monetized, losing the right to test proprietary technology makes the establishment of the dollar value of the loss especially difficult or speculative in this case. SimulTV submitted a Declaration of Steven Turner, the Chief Executive Office of SimulTV, wherein Turner explains that SimulTV has "certain proprietary compression technology that enables SimulTV to increase the numbers of TV channels per frequency by up to 60%." Id. at 17. According to Turner, SimulTV is planning to use the TV Stations, once it exercises its option in the SimulTV-DMG Agreement, to test this compression technology. See id. Turner states that without the SimulTV-DMG Agreement in place and the option to purchase the TV Stations outright, SimulTV would lose the opportunity to test this proprietary technology and would lose the ability to license this technology to other over-the-air TV station owners across the country. See id. The Court recognizes that placing a dollar value on the testing and licensing of proprietary technology is speculative, especially when SimulTV has not had the opportunity to test its technology yet. Therefore, the Court finds that, absent an injunction, DMG could dispose of at-issue assets and such a disposal would cause irreparable harm to SimulTV.

### c.  The Threatened Injury Outweighs the Threatened Harm

The third factor for a preliminary injunction "requires [the Court] to consider 'the competing claims of injury and ... the effect on each party of the granting or withholding of the requested relief.'" Heil Trailer Int'l Co. v. Kula, 542 F. App'x 329, 336 (5th Cir. 2013) (unpublished) (per curiam) (quoting Winter, 555 U.S. at 24). Having found irreparable harm, DMG would need to present powerful evidence of harm to its interests to prevent SimulTV from showing that the threatened injury outweighs any harm DMG would suffer as a result of the injunction. See Denton v. City of El Paso, 861 F. App'x 836, 841 (5th Cir. 2021) (unpublished).

SimulTV alleges that its threatened injury outweighs the harm to DMG; if the Court does not issue an injunction, SimulTV argues that DMG could sell the equity and assets to a third-party before the Court can decide the specific performance claim. See Record Document 4 at 20. The harm to DMG, SimulTV argues, is merely that DMG is bound by the terms of the contract it entered into with SimulTV. See id. DMG opposes this argument, stating that if the Court issues an injunction and "forces DMG's specific performance," then DMG would be "squashed." See Record Document 27 at 16.

DMG appears to misunderstand the purpose of the preliminary injunction. As stated earlier, the Court is not yet reaching the merits of SimulTV's claims and, at this juncture, "forcing DMG's specific performance" pursuant to the SimulTV-DMG Agreement would be premature. The purpose of the Court issuing a preliminary injunction is to maintain the status quo between the parties until the Court can reach a decision on the merits.

Here, the status quo would be maintained by preliminarily enjoining DMG from executing a sale to a third-party, which is the relief requested by SimulTV. The potential harm of withholding injunctive relief would result in SimulTV being deprived of its preferred contractual remedy. If the injunction were not to issue, DMG may irreparably harm SimulTV by selling the TV Stations and other assets to a third party and thereby infringe on SimulTV's contractual rights under the SimulTV-DMG Agreement. Further, preliminarily enjoining DMG from breaching a contract it signed after months of negotiations can hardly be said to harm DMG's interests. Therefore, the Court finds that the threatened injury to SimulTV outweighs the threatened harm to DMG.

### d. Public Interest is Served by Granting the Injunction

The final factor requires SimulTV to prove that granting the injunction will not disserve public interest. "[I]t is in the public interest to uphold contracts, and the public has an interest in knowing that persons who breach their agreements may not ... benefit from such conduct." Turnkey Offshore Project Servs., LLC v. JAB Energy Solutions, LLC, No. CV 21-672, 2021 WL 3509677 at *16 (E.D. La. 2021), modified, No. CV 21-672, 2022 WL 1699008 (E.D. La. 2022).

SimulTV argues that an injunction enforcing an agreement serves the public interest by signaling to contracting parties that they may not benefit from violating such agreements. See Record Document 4 at 20. DMG opposes this argument, stating that the Court should not uphold or ratify fraudulent or erroneous contracts. See Record Document 27 at 16. The Court addressed DMG's fraudulent misrepresentation argument above, stating that DMG is presumed to know the contents of a contract it signs. Based on this finding, the Court notes that issuing an injunction at this stage would not be

upholding a "fraudulent contract" but, rather, would serve public interest by upholding the contract and not allowing a party to breach the agreement.

## CONCLUSION

Based on the foregoing analysis, the Court finds that SimulTV has carried its burden of persuasion on all four factors and that SimulTV is entitled to a preliminary injunction. Therefore, SimulTV's Motion for a Preliminary Injunction is **GRANTED**. DMG is preliminarily enjoined from selling, transferring, or otherwise disposing of any of the TV Stations and/or any of DMG's equity, interests, or assets to any party other than SimulTV, all as set forth in the SimulTV-DMG Agreement, pending the final resolution of this action.

Additionally, SimulTV requested in the alternative that the Court issue a Writ of Sequestration. Because the Court is issuing a Preliminary Injunction, SimulTV's request for a Writ of Sequestration is **DENIED WITHOUT PREJUDICE**.

An order consistent with the terms of this memorandum ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 19th day of July, 2023.

S. MAURICE HICKS, JR., DISTRICT JUDGE
UNITED STATES DISTRICT COURT